Frank C. RIVERS et al., Appellants,

v.

CITY OF OWENSBORO, Kentucky, et al., Appellees.

Court of Appeals of Kentucky.

Feb. 7, 1956.

Byron, Sandidge & Holbrook, Ridley M. Sandidge, Owensboro, for appellants.

Joseph H. McKinley, Owensboro, for appellees.

Wyatt, Grafton & Grafton, Cornelius W. Grafton, Louisville, William L. Matthews, Jr., Lexington, amici curiae.

CAMMACK, Judge.

The appellants, plaintiffs below, filed this declaratory judgment action, individually and as representatives of all the owners of property abutting on Clinton Place East and Clinton Place West in the Clinton-Griffith Addition to the City of Owensboro, against the City. They sought a declaration of their rights as affected by the City's proposed plan for improvements of the named streets, a project to be financed by the issuance of "street improvement revenue bonds" under the provisions of the 1954 amendments to KRS 94.291 through KRS 94.325.

The complaint alleged that a resolution had been adopted by the City's Board of Commissioners, pursuant to KRS 94.292(2), setting forth the character and extent of the proposed improvements, and declaring such to be a necessity; and that following its adoption, the resolution had been published in a newspaper of general circulation, as required by KRS 94.292. It was alleged that the statutory provisions which authorized the improvements were unconstitutional and that unless the appellees were enjoined from proceeding with the plan, the appellants would suffer irreparable injury for which they had no adequate remedy at law.

Pursuant to the foregoing allegations, the appellants sought declarations on three specific problems, namely, (1) is it necessary for the City to hold an election to obtain the voters' approval of the bond issue, as required by Section 157 of the Kentucky Constitution for any indebtedness exceeding the City's income and revenue for the year in question; (2) do the proposed bonds constitute an indebtedness of the City and thus become subject to the municipal debt limitations of Sections 157 and 158 of the Kentucky Constitution; and (3) is it necessary to obtain court approval for the issuance of the bonds, as provided in KRS 66.210, relating to general obligation bonds.

The City joined in the prayer for a declaration of rights. The parties stipulated certain facts to the trial court. The resolution stated that the City proposed to issue bonds to be retired by an improvement tax levied against the abutting owners, and also to "issue any other bonds and take any and all other steps authorized by the aforesaid statutory provisions for the accomplishment of said improvements." It was stipulated that if the newly amended provisions of KRS 94.291 through KRS 94.325 were held valid, the City would proceed to take all further steps necessary under those statutes to finance the proposed

improvements. It was agreed that the project would be designated a "complete improvement" within the meaning of KRS 94.294, but a reservation would be made in the ordinance so as not to prevent the installation of sewer lines, water lines or sidewalk improvements within the 15-year period following the date of the ordinance. It was further stipulated that the "improvement revenue bonds" authorized by KRS 94.321 would be issued and the City would make such covenants in the bonds as "may be deemed necessary for the protection of the holders of same," as permitted by that statute; and that, if necessary or convenient, the City would issue the funding bonds which KRS 94.322(1) authorizes if any obligation concerning the "improvement revenue bonds" remains unpaid after all the improvement tax has been collected.

The trial court stated in his findings of fact that the resolution was the first step in an undertaking to improve the two streets in the manner provided in KRS 94.291 through KRS 94.325, as amended in 1954, and that if those statutes were held valid, the City would proceed to take all further steps under those provisions to accomplish the street improvements and their financing. The court's conclusions of law stated that the provisions of KRS 94.291 through KRS 94.325 were constitutional, both severally and in the aggregate. He said:

"* * * In reaching this conclusion, The Court interprets and considers KRS 94.322 as not imposing any personal liability or general tax obligation upon a municipality, and as not authorizing general tax obligation funding bonds to retire any personal or general tax liability, and as not imposing any duty to levy or collect general taxes to meet any such liability or to meet funding bonds issued to retire any such liability, if, under circumstances prevailing in the particular cases such personal or general tax liability, when added to the other indebtedness of the municipality, would exceed the maximum percentage of the value of taxable property permitted by

Section 158 of the Kentucky Constitution, or would require the levy of a general tax in excess of the tax rate permitted by Section 157 of the Kentucky Constitution."

He concluded also that (1) no election would be necessary for the purpose of obtaining the voters' approval of the bond issue; (2) bonds issued under KRS 94.317(9), KRS 94.321, or KRS 94.322 "will not constitute indebtedness of the City in violation of Section 157 or in violation of Section 158" of the Kentucky Constitution; and (3) bonds issued under KRS 94.317(9) and funding bonds issued under KRS 94.322 would be subject to the requirements of KRS 66.210 and KRS 66.220, providing for court approval of general bond issues, but bonds issued under KRS 94.321 and those, other than funding bonds, issued under KRS 94.322 would not be subject to those requirements, and no court approval would be needed for those issues. The court stated further that the City would not be prohibited from installing sewer or water lines, or sidewalk improvements, during the 15 years following the adoption of the ordinance, because the improvement was designated as a "complete," rather than a "stage" improvement, within the meaning of KRS 94.294. Accordingly, the court entered a judgment which denied injunctive relief to the appellants, and authorized the City to proceed with the proposed plan for improving the streets. The appeal is from that judgment.

As we view the case, the appeal involves only the task of interpreting the 1954 Act, consisting of amendments to KRS, Chapter 94, and the application of tests of constitutionality to the amendments as interpreted. Despite Section (6) of the 1954 Act, which recites an intention that its provisions be severable, we think it is clear, upon examining the Act in its entirety, that it constitutes a comprehensive "area" improvement plan, the particular parts of which essentially are closely related and dependent upon each other. A close analysis of the Act reveals that if one key section, KRS 94.322(1), were to be set aside as contrary to the Kentucky Constitution, the remaining provisions would

become insignificant and of no necessity, because of existing laws. Therefore, the purpose of the entire Act would be defeated. Under these circumstances, we conclude that it would be meaningless to say that the provisions of the Act are severable; so all its provisions must stand or fall together.

The impelling purpose of the Act is most clearly revealed in the amendment to KRS 94.322(1). That provision, as amended, reads:

"Improvement bonds issued under KRS 94.321, and the interest thereon, shall be payable exclusively out of the funds actually collected by the city on account of the improvement taxes in anticipation of which the bonds are issued, and, except as provided in KRS 94.305, KRS 94.323 and herein, the city shall in no event be liable on any such bonds except to the extent of funds so actually collected. If, after the collection by the city of the improvement tax from property owners, any improvement bonds or interest thereon remain unpaid, the city shall thereupon be personally and directly liable for the unpaid balance of such interest and principal and shall levy and collect to the extent necessary general taxes for the payment thereof, or may issue funding bonds, the proceeds of which shall be used to retire such unpaid balance of interest and principal, such funding bonds to be payable from general taxes levied and collected to the extent necessary."

On its face, the language seems to be contradictory. It states initially that the improvement bonds will be payable *exclusively* out of collections of the improvement tax; but it goes on to state that if such collections turn out to be insufficient to pay the entire obligation, then the city "shall thereupon be personally and directly liable for the unpaid balance," such debt to be paid by levying general taxes, or by issuing funding bonds payable from general taxes. Hence, it purports to create special obligation bonds, which may later become,

through the occurrence of certain contingencies, general obligation bonds constituting indebtedness of the issuing city.

Thus the statute permits the combination of two types of municipal financing which would seem to obliterate the distinction which long has existed between special assessment bonds and general obligation bonds. Our previous decisions have noted that the former are payable only from collections made upon the property owners who are assessed for the benefits they receive from the resulting improvements. Hence, they do not represent a debt of the municipality and are not subject to constitutional restrictions on such indebtedness. On the other hand, general obligation bonds are subject to payment through the coercion of general municipal taxes and therefore represent debts for which the city is liable personally. As such, they constitute "indebtedness" within the meaning of Sections 157 and 158 of our Constitution. Section 157 requires the assent of two-thirds of the voters for any indebtedness in an amount exceeding in any year, the income and revenue provided for that year. It also establishes a maximum tax rate which may be used to retire the indebtedness. Section 158 establishes a maximum limit on the indebtedness, based on the value of the taxable property therein, which a taxing district can incur even with the assent of two-thirds of the voters under Section 157. Parsons v. Arnold, 235 Ky. 600, 31 S.W.2d 928. And the General Assembly does not have the power to lessen—Fiscal Court of Estill County v. Debt Commission of Kentucky, 286 Ky. 114, 149 S.W.2d 735—or to increase—Boll v. City of Ludlow, 227 Ky. 208, 12 S.W.2d 301—the amount of debt authorized by this section. These sections (Kentucky Constitution, §§ 157, 158), which apply to localized political entities, differ sharply from those applicable to the high sovereignty of State Government (Kentucky Constitution, §§ 49 and 50) where the only debt limitation seems to lie within the will of a majority of the voters, and perhaps, the money lenders.

At times this Court has been forced—because of the peculiar exigencies of the

case—to approve an indebtedness of a taxing unit authorized by proper vote (a tax levy); and occasionally in excess of the maximum sum allowed on the assessed value of the property located in a taxing unit, as in the case of Griffin v. Clay County, 304 Ky. 592, 201 S.W.2d 733, where various claims had been adjudged by this Court to be valid and binding obligations of Clay County, and the creditors sought to require the county officials to levy a tax sufficient to satisfy the entire indebtedness even though the levy exceeded the fifty cent limitation set by Section 157 of our Constitution. The opinion in that case indicates only that the local entity would not be permitted to hide behind the shield of constitutional immunity after it had contracted valid debts which should be paid, and concluded that those sections were inserted to protect the financial integrity of a taxing district which could not be achieved by refusing to pay valid judgments against it.

In the case at bar we have no such problem, the question being, Should the debts be created; not Should valid debts be paid? Furthermore, it must not be forgotten that the Act under consideration attempts to permit the combination of special assessment bonds with revenue bonds, which bonds have few legal procedural aspects in common. Then too, under KRS, Chapter 58, the provisions of which are referred to in the Act under consideration, surplus general funds may be used to aid revenue projects, and we have so indicated. Fayette County Fiscal Court v. Fayette County, 314 Ky. 595, 236 S.W.2d 455; McKinney v. City of Owensboro, 305 Ky. 254, 203 S.W.2d 24.

At least three possible interpretations of Section (1) of KRS 94.322 have been suggested. They are: (1) these bonds are special obligation bonds and the City will be personally liable for them only if, *through its negligence,* the special assessment fails to pay the bond obligation in full; (2) the City will be liable personally whenever the special assessment is insufficient, *regardless of the cause thereof,* but the bonds are not subject to the constitutional or statutory limitations on "indebtedness" since the

bonds are initially special obligations and do not constitute "indebtedness" of the City until the special assessment collections are terminated and the obligation remains unsatisfied; and (3) the City will be liable personally for the bonds in every case unless, in the particular situation, the constitutional limit on "indebtedness" would be exceeded, in which case the bonds can be paid only from the special assessment funds, and therefore are not general obligation bonds constituting "indebtedness" of the City.

There can be but little doubt that the provision making the City liable personally for any deficiencies occurring in the payment of street improvement bonds is an effort to increase the salability of those bonds and thus make it easier for cities to finance street improvements. Only the second of the suggested interpretations of KRS 94.322 (1), set out above, is consistent with that objective. Suggestion (1) would in no way increase the salability of such bonds because, under our recent decision in Knepfle v. City of Morehead, 301 Ky. 417, 192 S.W.2d 189, 192, cities were already liable personally for deficiency claims of the holders of street assessment bonds caused by a city's negligence in levying or collecting the assessments. Hence, that particular interpretation of the 1954 Amendment would merely adopt presently existing case law and would not in any way render street improvement bonds more marketable.

Interpretation (3) likewise would fail to improve the market for bonds of this type. This conclusion is substantiated by the fact that, as a practical matter, street improvement projects ordinarily are not financed through the issuance of general obligation bonds because the debt limits imposed by the Constitution would be exceeded. Otherwise, such projects could be financed easily by the more readily salable general obligation bonds. It is obvious therefore that this legislation would fail to provide the desired relief if it merely permitted the issuance of street improvement bonds, bolstered by the general tax funds of a city, in instances where the newly created indebtedness would not surpass the constitu-

tional limits. For this reason, we think the proposed interpretation (3) must be rejected also.

Only the proposed interpretation (2) remains to be considered. It alone would seem to accomplish the underlying purpose of the 1954 Act. It is clear that, considering the financial circumstances under which street improvement bonds are issued ordinarily, the marketability of such bonds would be increased most effectively by contracting to pay their underlying obligation from the City's general tax funds if the special assessment funds are insufficient to pay that obligation. At the same time, it is clear that the Legislature did not intend these bonds to be subject to the limitations imposed by Sections 157 and 158 of our Constitution because, prior to the enactment of this legislation, municipalities were authorized to pledge their general funds subject to those limitations, and no further authorization was needed. Therefore, we conclude that the Legislature intended, through the adoption of the 1954 Amendment to KRS 94.322 (1), to authorize the issuance of bonds supported, in the last instance, by the general tax funds of the issuing municipality, but at the same time not subject to the constitutional requirements of Sections 157 and 158.

The statute, as interpreted, raises a serious constitutional question. The theory which the City urges in support of the statute is that, *at the time of their issuance*, these bonds are special obligation bonds which in no way affect the general indebtedness of the City, and only through the future occurrence of certain contingencies, namely, deficiencies of the special assessment funds, can the City become personally liable for payment of the bonds. They emphasize that the City may never become personally liable, and, in any event, at the time the bonds are issued, the time when the City's liability will arise and its then existing financial status, are matters which are impossible to foresee. Hence, they contend the constitutional provisions of Sections 157 and 158, pertaining to general indebtedness of municipalities, and other taxing districts, do not apply.

The Knepfle case is cited as authority for that proposition. However, in that case we stated expressly that the "indebtedness" referred to in Section 157 of the Constitution refers to that "created by contract or voluntarily incurred," and "does not include a liability imposed by law for what is done without right or what is done negligently." Despite the fact that under the 1954 Act the City's liability is initially contingent, it nevertheless is one voluntarily created, rather than one imposed by law. As such, it comes within the meaning of "indebtedness" in Sections 157 and 158 of the Constitution, and must comply with those restrictions on municipal indebtedness. Since the 1954 Act does not require compliance with those provisions, it is unconstitutional and void in its entirety. Of course, the City may proceed in the usual manner with its plan to improve the streets named in the record (KRS, Chapter 94, before the 1954 amendments, and other pertinent statutes).

The judgment is reversed, with directions to set it aside, and for proceedings consistent with this opinion.